# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 25, 2014

## IN THE MATTER OF: JAMAZIN H. M.

**Direct Appeal from the Juvenile Court for Madison County**
**No. 53-47, 309      Christy R. Little, Judge**

---

**No. W2013-01986-COA-R3-PT - Filed May 28, 2014**

---

This appeal involves the termination of a father's parental rights on numerous grounds. We affirm the trial court's finding that grounds for termination exist, due to incarceration under a ten year sentence, severe child abuse, persistent conditions, and abandonment by an incarcerated parent, and we affirm the trial court's finding that termination is in the child's best interest. We vacate the trial court's finding of willful failure to pay child support but otherwise affirm the order as modified.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

William E. Tallent, Jackson, Tennessee, for the appellant, J. M.

Robert E. Cooper, Jr., Attorney General and Reporter, Ryan L. McGehee, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services

Lanis L. Karnes, Guardian *ad Litem*, Jackson, Tennessee

## OPINION

## I. FACTS & PROCEDURAL HISTORY

Jamazin M. was born out-of-wedlock to Cheryle B. ("Mother") and James M. ("Father") on December 6, 2011. Father was listed on Jamazin's birth certificate, and DNA testing later confirmed that he is in fact Jamazin's father.

Less than one month after Jamazin's birth, the Tennessee Department of Children's Services ("DCS") received a report that Jamazin had a dime-sized bruise to his forehead. There were also reported concerns regarding issues of domestic violence between Mother and Father, as well as Mother's history with drugs, as she had three other children removed from her custody in 2010 when one of the children tested positive for cocaine at birth.[1]

As a result of the report regarding Jamazin, hair follicle drug screens were administered to Mother and to Jamazin on December 29, 2011. Mother's drug screen tested positive for cocaine in the amount of 1581 pg/mg. Jamazin's drug screen tested positive for cocaine in the amount of 29,670 pg/mg and for cocaethylene in the amount of 114 pg/mg.[2] Jamazin was taken into the protective custody of DCS on January 4, 2012, when he was four weeks old, and placed in a foster home where he remains to this day.

Father has a lengthy criminal history involving several drug convictions dating back to 2000. On February 1, 2012, just four weeks after Jamazin was taken into DCS custody, Father was placed on probation in connection with recent convictions for possession of cocaine with intent to sell and unlawful possession of a firearm.[3] Shortly thereafter, on or about February 9, Father failed a drug screen by testing positive for cocaine and marijuana. As a result, Father was deemed to have violated his probation, and he returned to prison on February 21, 2012, to serve an effective ten-year sentence for his crimes.

---

[1] Mother's other children have different fathers.

[2] At trial, the juvenile court judge stated that this was one of the highest concentrations of cocaine on a drug screen that she had ever encountered, if not the highest.
Cocaethylene is a metabolite formed by the body when cocaine and alcohol are both present in the body at the same time. *State v. Scott*, No. M2006-02067-CCA-R3-CD, 2008 WL 4253722, at *16 (Tenn. Crim. App. Sept. 17, 2008); *State v. Carter*, No. E2005-01282-CCA-R3-CD, 2007 WL 1515010, at *4 (Tenn. Crim. App. May 24, 2007).

[3] The offenses were committed in 2011, while Mother was pregnant with Jamazin.

On March 27, 2012, the juvenile court of Madison County found by clear and convincing evidence that Jamazin was a dependent and neglected child. That same day, the Juvenile Court entered a separate order finding that Jamazin was also the victim of severe child abuse perpetrated by Mother and Father. According to the order, a doctor confirmed that the suspected bruise on Jamazin's forehead was actually a Mongolian spot, a type of birthmark. However, the court went on to discuss the positive drug screens for Jamazin and Mother, the fact that Father had also tested positive for cocaine on a drug screen administered by his probation officer, the fact that Father and Mother reportedly lived at the same address, and medical testimony that "even one exposure to cocaine could cause serious bodily injury or death to the child." Based on this evidence, the court found that both Mother and Father were responsible for severely abusing Jamazin.[4] Father filed a notice of appeal to the circuit court on March 30, 2012.

In July 2012, the juvenile court ratified a permanency plan that listed goals for Jamazin of either adoption or exiting custody to live with a relative. On August 2, 2012, DCS filed a petition to terminate Mother and Father's parental rights as to Jamazin.[5] The petition alleged numerous grounds against Father, including abandonment by failure to visit or support, abandonment by failure to establish a suitable home, abandonment by an incarcerated parent, persistent conditions, severe child abuse, and incarceration under a ten-year sentence. Counsel was appointed for Father, and a guardian ad litem was appointed for Jamazin.

While the termination proceedings were pending in juvenile court, the circuit court of Madison County heard the *de novo* appeal of the severe child abuse case. On December 3, 2012, the circuit court entered an order finding that Jamazin was dependent and neglected and also the victim of severe child abuse by Mother and Father. The court found that Father had been arrested on more than one occasion for "prior cocaine activity" and that he was currently incarcerated for possession of cocaine with intent to sell and his recent "handgun issues with the law." The court found that guns, scales, baggies, and approximately $4000 were found during the last arrest at the residence Father shared with Mother, "[a]ll of which are an indication of drug activity at that very residence." The court found that Father knew that Mother's other children had been removed from her custody due to drug issues, and also

[4] "Severe child abuse" includes "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death[.]" Tenn. Code Ann. § 37-1-102(b)(23)(A)(i).

[5] The petition also sought termination of parental rights as to Jamazin's older siblings. However, this appeal only concerns Father's parental rights to Jamazin, not the rights of Mother or the other siblings' fathers who were involved in the termination proceedings below. The order terminating Father's parental rights was made final pursuant to Tennessee Rule of Civil Procedure 54.02.

that Mother "had made [Father] aware of her failed drug screens while pregnant and after birth," such that Father "was certainly put on notice of the possibility that [Mother] was using drugs." The court found it undisputed that Jamazin had cocaine in his system and noted the testimony from the foster mother and from a doctor regarding "what the child went through with the withdrawal symptoms and having cocaine in his system." The court acknowledged the testimony of a medical expert that Jamazin's exposure to cocaine could have occurred postnatally due to the very high levels of cocaine detected by his initial drug screen and subsequent re-test, as the doctor testified (as summarized by the court) that "the times she has seen this high a level in a child this age typically represents acute and very recent exposure." In sum, the circuit court found that Father had a duty to protect his child, that "this father had plenty of information sufficient to put him on notice as to the circumstances that existed as to the drugs around this child and the danger to this child," and considering Father's own history with drugs and drug screens, he should have known that the circumstances were a threat to Jamazin. Simply put, the court concluded that "allowing this child to be in contact with these illegal drugs is severe abuse." As a result, the court found clear and convincing evidence that "Jamazin M[.] was the victim of severe child abuse at the hands of [Father], either directly or by failing to protect the child." This ruling was not appealed.

At the termination trial on June 4, 2013, counsel for DCS announced that it was only pursuing the grounds of "wanton disregard" by an incarcerated parent, persistent conditions, severe child abuse, and incarceration under a ten-year sentence. The juvenile court heard testimony from three DCS workers, from Jamazin's foster father, and from Father. For reasons that will be discussed in detail below, the trial court found by clear and convincing evidence that grounds existed for termination of Father's parental rights based upon abandonment by an incarcerated parent, incarceration under a ten-year sentence, persistent conditions, and severe child abuse. The court also found by clear and convincing evidence that it was in Jamazin's best interest for Father's parental rights to be terminated. Father timely filed a notice of appeal.

## II. ISSUES PRESENTED

Father presents the following issues for review on appeal:

1. Whether the Trial Court's findings regarding the grounds for termination of the Father's parental rights are supported by clear and convincing evidence.

2. Whether the Trial Court's finding that terminating Father's parental rights is in the best interest of the minor child is supported by clear and convincing evidence.

-4-

For the following reasons, we affirm the trial court's order as modified and thereby affirm the termination of Father's parental rights.

## III. STANDARD OF REVIEW

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007); *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). Although the parent's right is fundamental and superior to the claims of other persons and the government, it is not absolute. *In re J.C.D.*, 254 S.W.3d at 437. A parent's right "continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *Id.*; *see also In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In Tennessee, proceedings to terminate a parent's parental rights are governed by statute. "Parties who have standing to seek the termination of a biological parent's parental rights must prove two things." *In re Audrey S.*, 182 S.W.3d at 860; *see also In re M.J.B.*, 140 S.W.3d at 653. First, they must prove the existence of at least one of the statutory grounds for termination, which are listed in Tennessee Code Annotated section 36-1-113(g). *Id.* Several grounds for termination are listed in subsection (g), but the existence of any one of the grounds enumerated in the statute will support a decision to terminate parental rights. *In re Angela E.*, 303 S.W.3d 240, 251 (Tenn. 2010); *In re S.R.C.*, 156 S.W.3d 26, 28 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). Second, the petitioner must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i). *In re Audrey S.*, 182 S.W.3d at 860. In light of the constitutional dimension of the rights at stake in a termination proceeding, the person seeking to terminate these rights must prove all the elements of the case by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). In sum, in order to terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013); *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). Clear and convincing evidence has been defined as "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Id.* at 640 (citing *In re Valentine*, 79 S.W.3d at 546). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Audrey S.*, 182 S.W.3d at 861.

Because of this heightened burden of proof in parental termination cases, on appeal we must adapt our customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d).  *In re Audrey S.*, 182 S.W.3d at 861.  First, we review each of the trial court's specific factual findings *de novo* in accordance with Rule 13(d), presuming the finding to be correct unless the evidence preponderates against it.  *In re Adoption of Angela E.*, 402 S.W.3d at 639.  Second, we must determine whether the facts (either as found by the trial court or as supported by the preponderance of the evidence) amount to clear and convincing evidence that one of the statutory grounds for termination exists.  *Id.* at 639-40. Whether a statutory ground has been proven by the requisite standard of evidence is a question of law to be reviewed *de novo* with no presumption of correctness.  *In re R.L.F.*, 278 S.W.3d 305, 312 (Tenn. Ct. App. 2008) (citing *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008)).

## IV.  DISCUSSION

### A.  Ten-Year Sentence

The first ground for termination that we will consider is based upon Father's incarceration under a ten-year sentence.  Tennessee Code Annotated section 36-1-113(g)(6) states that grounds exist for termination if:

> The parent has been confined in a correctional or detention facility of any type, by order of the court as a result of a criminal act, under a sentence of ten (10) or more years, and the child is under eight (8) years of age at the time the sentence is entered by the court[.]

"When terminating parental rights pursuant to § 36-1-113(g)(6) there are only two necessary findings relative to this statutory ground. Specifically, that the parent 'has been confined in a correctional or detention facility of any type, by order of the court as a result of a criminal act, under a sentence of ten (10) or more years,' and that the child was 'under eight (8) years of age at the time the sentence [was] entered by the court.'"  *In re E.M.P.*, No. E2006-00446-COA-R3-PT, 2006 WL 2191250, at *6 (Tenn. Ct. App. Aug. 3, 2006) (quoting Tenn. Code Ann. § 36-1-113(g)(6)).  Thus, establishing this ground for termination is "not a very difficult task" because the parent either is or is not serving a prison sentence of at least ten years, and the child either was or was not eight years old when the sentence was imposed.  *In re T.M.G.,* 283 S.W.3d 318, 325 n.4 (Tenn. Ct. App. 2008).  Indeed, we have stated that in enacting subsection (g)(6), "the legislature has established a 'bright line' ground for

termination of parental rights."[6]  *In re Adoption of K.B.H.*, 206 S.W.3d 80, 85 (Tenn. Ct. App. 2006).

We find both elements present in this case.  In 2012, Father was convicted of two counts of possession of cocaine with intent to sell, and he received an eight-year sentence on one count and a four-year sentence on the other count.  The sentences on these counts run concurrently.  Also in 2012, Father was convicted of felony possession of a weapon by a convicted felon and for two misdemeanors (theft of property under $500 and possession of drug paraphernalia), for which he received a two-year sentence to run consecutive to his aforementioned eight-year sentence, for an effective ten-year sentence.  Father's probation was revoked and he was ordered to serve his sentences with the Tennessee Department of Correction.

Father's brief on appeal does not raise any challenge with regard to this ground for termination.  Obviously, Jamazin was under eight years old when the sentences were entered. In addition, Father is incarcerated "under a sentence of ten (10) or more years," within the meaning of the statute.  Although Father was actually sentenced to an eight-year sentence and a two-year sentence, which run consecutively for an effective ten-year sentence, we note that this does not preclude a finding that grounds for termination exist under subsection (g)(6). *See In re E.M.P.*, 2006 WL 2191250, at *6-7 (finding that a mother who was sentenced to serve eight years and three years consecutively was serving a sentence of ten or more years as set forth in the statute and rejecting the mother's argument that the two sentences could not be combined for purposes of the statute); *H.M.R. v. J.K.F.*, No. E2004-00497-COA-R3-PT, 2004 WL 1944138 (Tenn. Ct. App. Sept. 1, 2004) (finding that an eight-year sentence running consecutive to a four-year sentence met the requirement of the statute); *State, Dept. of Children's Services v. Wilkerson*, No. 03A01-9810-JV-00341, 1999 WL 775759, at *1-2 (Tenn. Ct. App. E.S. Sept. 15, 1999) (finding the ground applicable where the father was sentenced to eight years for one offense and two years for another).  Consequently, we find this ground for termination of parental rights was proven by clear and convincing evidence.

Even though the termination statute only requires the finding of one ground to justify terminating parental rights, our Supreme Court has instructed the Court of Appeals to review the trial court's findings of fact and conclusions of law as to each ground for termination asserted, in order to further the policies of permanently placing children, reaching just and

---

[6] This ground for termination applies regardless of the possibility of early parole, *In re Adoption of K.B.H.*, 206 S.W.3d at 84-85; *In re M.B.*, No. M2007-02755-COA-R3-PT, 2008 WL 2229518, at *5 (Tenn. Ct. App. May 29, 2008), or the fact that the underlying offense was committed prior to the child's birth.  *In re G.L.T.*, No. M2008-00582-COA-R3-PT, 2008 WL 3914922, at *5 (Tenn. Ct. App. Aug. 25, 2008).

speedy resolutions of cases, and preventing unnecessary remands of cases heard by the Supreme Court. ***In re Angela E.***, 303 S.W.3d at 251 n.14. Therefore, we will proceed to consider the other grounds found by the trial court.

### B. Severe Child Abuse

Next, we will consider the termination ground related to severe child abuse, which is set forth at Tennessee Code Annotated section 36-1-113(g)(4) as follows:

> The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian[.]

Here, the circuit court of Madison County found, as discussed above, that Father committed severe child abuse against Jamazin as defined by Tennessee Code Annotated section 37-1-102(b)(23). Accordingly, the juvenile court hearing the termination petition found that grounds for termination existed pursuant to section 36-1-113(g)(4). We likewise find that grounds exist under subsection (g)(4). "This Court has discussed the ramifications of a finding of severe child abuse against a biological parent in dependency and neglect proceedings, and its impact on a later action to terminate parental rights: 'The most serious consequence of a finding that a parent has committed severe child abuse is that such a finding, in and of itself, constitutes a ground for termination of parental rights.'" ***In re J.C.H.***, No. W2012-01287-COA-R3-PT, 2012 WL 6466631, at *10 (Tenn. Ct. App. Dec. 14, 2012) (quoting *Tenn. Dep't of Children's Servs. v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn. Ct. App. Mar. 8, 2005)); *see also* ***State, Dept. of Children's Services v. H.A.C.***, No. M2008-01741-COA-R3-JV, 2009 WL 837709, at *2 n.1 (Tenn. Ct. App. Mar. 26, 2009). Thus, for purposes of subsection (g)(4), "once the finding of severe child abuse in the dependency and neglect proceedings becomes final, '[t]he ground itself is proved by [the] prior court order finding severe child abuse, and the issue of whether abuse occurred is not re-litigated at the termination hearing.'" ***In re J.C.H.***, 2012 WL 6466631, at *10 (quoting *M.S.*, 2005 WL 549141 at *10). It is undisputed that Father did not appeal the circuit court's finding of severe child abuse, and that order became final. Therefore, this ground for termination of Father's parental rights "is effectively established." ***In re Samaria S.***, 347 S.W.3d 188, 201 (Tenn. Ct. App. 2011).

### C. Persistent Conditions

Next we will consider the ground for termination that is commonly referred to as "persistent conditions," defined in Tennessee Code Annotated section 36-1-113(g)(3) as follows:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

The purpose behind the "persistent conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008). In cases involving this ground, DCS is not required to prove that a parent-child relationship cannot be salvaged, nor is DCS required to show that a parent is "currently harmful" to a child's safety or future emotional stability. *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000). The termination of parental rights statutes recognize a child's need for a permanent, stable environment. *Id.* Accordingly, the question is the likelihood that the child can be safely returned to the custody of the parent, not whether the child can safely remain in foster care with weekly visits with the parent. *Id.* A parent's continued inability to provide fundamental care to a child, even if not willful, whether caused by a mental illness, mental impairment, or some other cause, constitutes a condition which prevents the safe return of the child to the parent's care. *In re T.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000).

In this case, Jamazin has been in foster care continuously since January 4, 2012, when he was four weeks old. Father has been incarcerated since February 21, 2012, when Jamazin was eight weeks old. Jamazin was eighteen months old at the time of the termination trial. The trial court found:

The conditions that prevent the return of Jamazin to the father's home include, but are not limited to, continued drug usage, continued incarceration, and an environment of drugs. The Court finds that his biggest persistent condition is that he cannot get away from drugs, especially cocaine. The Court finds that cocaine is what brought the child into custody and that condition is what is keeping the child in custody.

Unfortunately, for Father, we must agree with the trial court. Father was 34 years old at the time of trial, and he admitted that his history with cocaine dates back many years. In 2001, he was convicted for possession of cocaine with intent to sell and received an eight-year sentence. He served four years of his sentence and was released in July 2005. He returned to prison after only six months, as he was convicted in 2006 of felony evading arrest, possession of cocaine, and unlawful possession of a firearm. Father was released in November 2010, and he was arrested again on or about April 12, 2011, while Mother was pregnant with Jamazin. He was convicted of two counts of possession of cocaine with intent to sell. Father testified that Mother told him that she was pregnant at some point in April 2011 and that this was his "inspiration to change," so he "changed and got a job." However, Father's actions demonstrate that he continued a lifestyle that prioritized cocaine over his child. In July 2011, Father committed additional offenses, for which he was ultimately convicted of felony possession of a weapon by a convicted felon, theft of property under $500, and possession of drug paraphernalia. Jamazin was born in December 2011. He was undoubtedly exposed to very high levels of cocaine, either prenatally, postnatally, or both, and he was removed from the home in January 2012 at only four weeks old. Jamazin's family service worker at DCS testified that Father "refused every drug screen that we had offered him" during DCS's involvement with Father prior to his incarceration. She said that Father was initially cooperative and seemed to be considering changes in his lifestyle until DCS requested drug screens, and " then it was just shutdown communication." Father was placed on probation for the aforementioned drug and weapons charges on February 1, 2012, when Jamazin was approximately eight weeks old, and he failed a drug screen by his probation officer just days later, on or about February 9, by testing positive for cocaine and marijuana. At trial, Father admitted that he had used cocaine, consumed alcohol, and "was out at places that [he] didn't need to be," which led to the violation of his probation. Father engaged in such conduct despite the fact that Father had just been placed on probation for possession of cocaine and had his newborn child removed from his home weeks earlier due to cocaine exposure. Obviously, Father knew that he would not be able to care for Jamazin if he returned to prison, yet that was a risk Father was willing to take. As a result of Father's decision, he was ordered to serve out his effective ten-year sentence in prison.

Despite Father's protestation that Jamazin inspired him to change, his actions speak louder than his words. "[I]n parental rights matters, the court does not look to the

-10-

protestations of affections and expressed intentions of the parent, but rather the parent's course of conduct." ***In re Weston T.R.***, No. M2012-00580-COA-R3-PT, 2012 WL 3804414, at \*7 (Tenn. Ct. App. Aug. 31, 2012) (quoting *State of Tennessee, Dep't of Children's Servs. v. J.M.F.*, 2005 WL 94465, at \*7 (Tenn. Ct. App. Jan. 11, 2005)). We note that Father presented some certificates at trial indicating that he had completed several programs while incarcerated, and these achievements are commendable. However, Father's track record of returning to cocaine after each of his previous incarcerations is quite disturbing, and Jamazin should not have to wait for Father to be released from prison in order to see if Father can truly stay away from cocaine.

Considering all the circumstances, we find there is clear and convincing evidence that Jamazin has been removed from the home for more than six months, the conditions that led to his removal still persist and prevent his safe return to Father's care, there is little likelihood that these conditions will be remedied at an early date so that Jamazin can be safely returned to Father in the near future, and continuation of the parent-child relationship greatly diminishes Jamazin's chances of early integration into a safe, stable and permanent home. Therefore, the ground of persistent conditions has been established.[7]

### D. Abandonment by Incarcerated Parent

Next we will consider the trial court's finding of abandonment by an incarcerated parent pursuant to Tennessee Code Annotated sections 36-1-113(g)(1) and 36-1-102(1)(A)(iv). For purposes of terminating parental rights, "abandonment" has several statutory definitions, but the one relevant here provides that abandonment occurs when:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and *either* has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's

---

[7] We note that the ground of persistent conditions normally requires a finding that DCS has utilized reasonable efforts to reunite the parent and the child. However, reasonable efforts are not required "if a court of competent jurisdiction has determined that" certain statutorily defined "aggravated circumstances" exist. Tenn. Code Ann. § 37-1-166(g)(4)(A). In that case, DCS may reasonably forego efforts to reunify a family and immediately begin termination proceedings. ***In re Bernard T.***, 319 S.W.3d 586, 600 (Tenn. 2010). One of the statutorily defined aggravated circumstances is severe child abuse. Tenn. Code Ann. § 36-1-102(9). Therefore, based on the previous judicial finding that Father perpetrated severe child abuse against Jamazin, reasonable efforts need not be demonstrated here.

incarceration, *or* the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (emphasis added). It is important to note that this definition specifies different ways in which an incarcerated parent can be deemed to have abandoned a child. *See In re Audrey S.*, 182 S.W.3d at 865 ("This definition contains two distinct tests for abandonment.") "Parties and courts must take care not to conflate these grounds." *In re Kierra B.*, No. E2012-02539-COA-R3-PT, 2014 WL 118504, at *8 (Tenn. Ct. App. Jan. 14, 2014).

The trial court's order found abandonment by an incarcerated parent for two reasons: Father "willfully failed to support his child for four (4) months immediately preceding his incarceration," and Father "engaged in such conduct prior to incarceration as to exhibit a wanton disregard for the welfare of his child." On appeal, Father basically argues that he did not have the ability to pay child support. We find that the trial court's finding of abandonment based upon willful failure to support must be vacated for several reasons. The trial court's order merely recites that Father "has not contributed to the support of his child since his removal" although Father "was able bodied and capable of working and supporting his child prior to his incarceration" and "aware of his duty to support his child." The only evidence regarding support that was presented at trial came when a DCS worker was asked if Father or his family had sent gifts, clothing, cards, money, or anything for the child, and another DCS worker was asked whether Father had purchased diapers or anything since the child was in foster care or otherwise done anything to show that he could support the child, to which the workers responded, "No." Father mentioned at trial that he had a job at an air duct cleaning company when Mother was pregnant with Jamazin. However, there was no evidence beyond this that would support a finding of willful failure to support by clear and convincing evidence.[8] Moreover, counsel for DCS announced prior to trial that DCS was only seeking termination of Father's parental rights based upon "[t]en year sentence, severe abuse, persistent conditions and wanton disregard." The same was reiterated during closing arguments. For these reasons, we modify the order of the trial court to eliminate the finding of abandonment by an incarcerated parent for willful failure to support as a ground for the termination of Father's parental rights.

Now we turn to the issue of abandonment when a parent "has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." Tenn.

_____

[8] At the conclusion of the termination trial, the trial judge remarked, "No child support or token support. I don't think he could have paid any actual monetary support. That's by his own choosing[.]" However, this ambiguous statement falls short of the specific findings that are necessary to a determination of willfulness.

Code Ann. § 36-1-102(1)(a)(iv). This test for abandonment "reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 866. Because incarceration severely compromises a parent's ability to perform his or her parental duties, "[a] parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." *Id.* (citing James G. Dwyer, *A Taxonomy of Children's Existing Rights in State Decision Making About Their Relationships*, 11 Wm. & Mary Bill Rts. J. 845, 958 (2003)). Thus, incarceration serves as "a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.*

"The ground of wanton disregard does not require that the conduct referred to occur within the four month window prior to incarceration." *In re D.M.*, No. M2009-00340-COA-R3-PT, 2009 WL 2461199, at *4 (Tenn. Ct. App. Aug.12, 2009). This test for abandonment "is not expressly limited to any particular four-month period." *In re Audrey S.*, 182 S.W.3d at 865. Therefore, "no specified time frame limits which pre-incarceration acts or omissions are subject to review." *In re B.P.C.*, No. M2006-02084-COA-R3-PT, 2007 WL 1159199, at *9 (Tenn. Ct. App. W.S. Apr. 18, 2007). In fact, "the conduct may occur before the birth of the child whose welfare is thereby put at risk." *In re T.M.H.*, No. M2008-02427-COA-R3-PT, 2009 WL 1871873, at *7 (Tenn. Ct. App. Jun.29, 2009) *perm. app. denied* (Tenn. Sept. 18, 2009); *In re D.M.*, 2009 WL 2461199, at *4.

In this case, Father was incarcerated when the termination petition was filed, and the trial court found that Father engaged in conduct prior to incarceration that exhibited a wanton disregard for Jamazin's welfare. This finding is supported by clear and convincing evidence. Despite Father's claim that Mother's pregnancy with Jamazin inspired him to change, the evidence shows that Father did not manage to stay away from cocaine. The offenses for which Father is currently incarcerated – possession of cocaine with intent to sell, unlawful possession of a firearm, and others – were committed while Mother was pregnant with Jamazin. Either prenatally or postnatally, Jamazin was exposed to high levels of cocaine, which led to his removal from the home at four weeks old. Father was placed on probation for his drug and weapon charges when Jamazin was eight weeks old, but rather than staying out of trouble, Father failed a drug screen just days later, testing positive for cocaine and marijuana. This evidence clearly and convincingly demonstrates that Father exhibited a wanton disregard for Jamazin's welfare. As stated above, a parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child. *In re Audrey S.*, 182 S.W.3d at 866. Based on Father's history, we readily conclude that Father's "behavior that resulted in incarceration is part of a broader

-13-

pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.* "We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id.* at 867–68 (citing *State Dep't of Children's Servs. v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *7–8 (Tenn. Ct. App. Jan. 11, 2005); *In re C. LaC.*, No. M2003-02164-COA-R3-PT, 2004 WL 533937, at *7 (Tenn. Ct. App. Mar. 17, 2004); *In re C.T.S.*, 156 S.W.3d 18, 25 (Tenn. Ct. App. 2004); *In re C.W.W.*, 37 S.W.3d 467, 474–75 (Tenn. Ct. App. 2000)). Furthermore, "[o]ur courts have consistently held that an incarcerated parent who has multiple drug offenses and wastes the opportunity to rehabilitate themselves by continuing to abuse drugs, resulting in revocation of their parole and reincarceration, constitutes abandonment of the child, and demonstrates a wanton disregard for the welfare of the child." *In re DNG*, No. M2003-02810-COA-R3-PT, 2004 WL 2314534, at *2 (Tenn. Ct. App. E.S. Oct. 13, 2004) (citing *In re C.W.W.*, 37 S.W.3d at 473; *State v. J.S.*, 2001 Tenn.App. Lexis 796 (Tenn. Ct. App. 2001); *G.M.C. v. A.V.I.*, 2000 WL 1195686 (Tenn. Ct. App. 2000); *State v. D.G.S.L.*, 2001 Tenn.App. Lexis 941 (Tenn. Ct. App. 2001); *State v. Grant*, 2002 Tenn.App. Lexis 158 (Tenn. Ct. App. 2002); *Dept. Of Children's Serv. v. Wiley*, 1999 WL 1068726 at *7 (Tenn. Ct. App. 1999)). We have also held that exposing a child to drugs demonstrates a wanton disregard for the child's welfare. *See, e.g.*, ***In re O.J.B.***, No. W2009-00782-COA-R3-PT, 2009 WL 3570901, at *5 (Tenn. Ct. App. Nov. 2, 2009) (involving a child born with cocaine in her system and a mother who continued to commit crimes while pregnant); ***State, Dept. of Children's Services v. Harville***, No. E2008–00475–COA–R3–PT, 2009 WL 961782, at *8 (Tenn. Ct. App. Apr. 9, 2009) (stating that exposing the child to cocaine in utero demonstrated a wanton disregard for the child's welfare); ***In re S.L.A.***, 223 S.W.3d 295, 300 (Tenn. Ct. App. 2006) (finding that a mother showed a wanton disregard for her child by ingesting drugs during her pregnancy and while breastfeeding); ***In re C.T.S.***, 156 S.W.3d 18, 25 (Tenn. Ct. App. 2004) (stating that the mother's ingestion of crack cocaine during her pregnancy "clearly exhibit[ed] a wanton disregard for the welfare of the child").

Considering all of the circumstances present in this case, including criminal behavior, repeated incarceration, a probation violation, continued substance abuse, and drug exposure of the child, we find clear and convincing evidence that Father demonstrated a wanton disregard for Jamazin's welfare, such that grounds exist for termination of his parental rights.

## E.    *Jamazin's Best Interest*

Having found that grounds exist for the termination of Father's parental rights, we now turn to the issue of whether termination of Father's parental rights is in Jamazin's best interest. Tennessee Code Annotated section 36-1-113(i) provides a list of factors that are

relevant when deciding what is in a child's best interest. However, the list is not exhaustive. In addition, "the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest." *In re Arteria H.*, 326 S.W.3d 167, 182 (Tenn. Ct. App. 2010).

We find that the evidence in the case at bar clearly and convincingly supports the trial court's finding that termination is in Jamazin's best interest. Jamazin has been in his current foster home since he was four weeks old. Father has not visited with Jamazin since prior to his incarceration when Jamazin was eight weeks old. Jamazin was eighteen months old at the time of the termination trial. One of the family service workers assigned to Jamazin's case testified that she personally attended medical appointments with Jamazin and his foster parents, and she observed Jamazin experiencing tremors, crying spells, and irritability as a result of his drug exposure. She also testified that she asked to be removed from the case after Father reportedly made threats of bodily harm to another worker. The subsequent case worker testified that Jamazin was doing exceptionally well and that his pediatrician has been amazed that Jamazin is "on target" and "developmentally on track" considering that he had so much cocaine exposure. She explained that his foster mother is a stay-at-home mother who can give Jamazin all the attention he needs. The case worker further testified that Jamazin is very bonded and comfortable with his foster family, stating, "That's all he knows is [his foster father and mother]." Jamazin's present caseworker similarly testified that Jamazin knows his foster parents as "mom" and "dad," and that she believed a change in caretaker would be traumatic for Jamazin. She testified that Father had not sent any letters, cards, or gifts to the child.

Jamazin's foster father also testified about the symptoms Jamazin experienced as a result of his drug exposure, including tremors, prolonged hiccups, reflux and vomiting constantly after eating. He testified that he and his wife had read everything they could in order to learn about children who were born addicted to drugs, and they were working with Jamazin to try to ensure he was meeting developmental milestones. He testified that he and his wife maintain contact with Jamazin's older biological siblings and try to treat them like an extended family in the hope that they will always be part of Jamazin's life. Jamazin's foster father testified that he and his wife hope to adopt Jamazin in the event that Father's parental rights are terminated.

Based on the entire record, the factors overwhelmingly weigh in favor of terminating Father's parental rights. Father has not "made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in [Father's] home." Tenn. Code Ann. § 36-1-113(i)(1). Father has not "maintained regular visitation or contact with the child," as he has not visited with the child since he was incarcerated, nor has he sent letters, cards, or gifts to him. Tenn. Code Ann. § 36-1-113(i)(3). There is no meaningful

relationship between Father and Jamazin. Tenn. Code Ann. § 36-1-113(i)(4). Changing Jamazin's caretakers and physical environment at this point would likely be traumatic for Jamazin, as his foster family is the only family he knows. Tenn. Code Ann. § 36-1-113(i)(5). Father has been found to have committed severe child abuse against Jamazin. Tenn. Code Ann. § 36-1-113(i)(6). And, Father has not demonstrated that he could establish a healthy and safe home for Jamazin, free from criminal activity and controlled substances. Tenn. Code Ann. § 36-1-113(i)(7).

The best interest of a child must be determined from the child's perspective and not the parents. *In re Arteria H.*, 326 S.W.3d at 182 (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)). We affirm the trial court's finding that Jamazin's best interest would best be served by terminating Father's parental rights.

## V. CONCLUSION

For the aforementioned reasons, the decision of the circuit court is hereby affirmed as modified. Costs of this appeal are taxed to the appellant, James M., for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.